Joynes, J.
This is an action of assumpsit by Snead and Smith against the Bichmond, Fredericksburg & Potomac Bailroad Company, to recover for certain work and labor performed by the slaves of the plaintiffs. The declaration contains only the common counts. And the principal question is, whether the money claimed by the plaintiffs is due from the railroad company or from Edwin Bobinson, who was president of the company at the time the work was done. The jury found a verdict for the plaintiffs; and the court overruled a motion of the defendants for a new trial. The bill of exceptions certifies the facts found on the trial. Such-was the obvious intention of the certificate, and I perceive no inconsistency between any of the “ facts” certified. It is not enough, however, that a bill should purport, by its terms, to certify “ the facts proved,” if such is really not the substance of what is certified. Vaiden’s case, 12 Gratt. 717.
The plaintiffs gave in evidence the following paper, the body and signature of which were proved to be in the handwriting of Bobinson, the president of the company, and which was given by him to one of the *356 plaintiffs upon a settlement for the work, which is the-ground of the present claim:
“ Richmond, May 31, 1856.
§484. Due Joseph H. Snead and Benjamin E. Smith four hundred and eighty-four dollars, in full, of labor performed on cottage lot of the railroad company, the same payable on demand, with interest from date.

Ed. Robinson.”

It does not distinctly appear, from the terms of this paper, whether it was designed to acknowledge a debt due by Robinson, who signed the paper in his own name, or by the company, whose officer and agent he was, and upon whose lot the work is stated to have been done. The language is ambiguous and consistent with either view, and parol evidence of the consideration, and of the origin of the paper, is admitted to explain its meaning in this respect. Early v. Wilkinson, 9 Gratt. 68, 1 Am. Lead. Cas. 606, 3d ed., notes to Rathbone v. Budling; Nash v. Towne, 5 Wall. U. S. R. 689. That would be so, even if the action were founded on the paper itself. It is so a fortiori where the action, as in this ease, is founded on the original consideration.
It was proved on the part of the plaintiffs, among other things, that they removed to Ashland, where the cottage lot is located, in the fall of 1854; that Robinson, who was the president of the railroad company, applied to the plaintiff Snead to hire the hands of the plaintiffs, and agreed to give him §1 25 a day for each of them; that during the months of November and December 1854, the hands worked under the direction of one Thompson, who was a section master upon the railroad of the defendants; that in January 1855, the hands of the plaintiff were turned over to the, control and management of the plaintiff Smith, who made all the contracts for work done by them and kept the *357 accounts; that they were seen at work under the direction of Thompson, the section master, sometimes upon the railroad of the defendants and sometimes upon the cottage lot, the property of defendants; that some of the first work done by the hands of the plaintiffs were paid for by the defendants; and that between 1852 and 1856 one Taylor was employed by said Robinson to do work upon the cottage lot of the defendants, for which work he was paid by defendants. It was further proved by the plaintiffs, that in the spring of 1856, the plaintiff Smith being about to remove from Ashland to the county of Lunenburg, the plaintiff Snead advised him to go down to Richmond and settle the accounts with the defendants; that Smith went down accordingly, and when he returned told Snead that he had taken a note with interest, but that in consequence of the action of Thompson he had been compelled to lose about $100.
These are all the material facts proved by the plaintiffs, except one or two, to be mentioned hereafter.
The defendants gave in evidence certain proceedings of the board of directors of the railroad company, and other documents connected therewith, from which the following facts appear:
In the year 1836, the railroad company purchased, for the purpose of procuring timber and wood for the use of the railroad, a tract of over 400 acres of land, on which Ashland is now situated. A cottage was subsequently built upon this land, but the date of its erection 'does not appear, though it seems to have been erected prior to November 1852. In November 1852 the board of directors passed a resolution authorizing the president to convey a title upon payment of the purchase money, to such persons as had purchased or might purchase any portion of the lands of the company in the neighborhood of the cottage. This build *358 ing was erected at the expense of the railroad compauy- In July 1857 the hoard passed a resolution that the president had, under the authority con-fem’ed by the resolution of November 1852, disposed of 48 acres and a fraction, of the land, comprising lots No. 22, 23 and 24, to himself and others associated with improvement known as the Hotel property, and that upon said lot No. 24, a building known as the Cottage building had been located at the expense of the company, the cost of which, with su'ch other improvements as had been made in like manner, was to be refunded by the said purchasers, and directing a conveyance of the said property to Edwin Hobinson and his associates, upon payment of the cost of such improvements and interest, to be ascertained by the treasurer and superintendent. In September 1857 a resolution was adopted appointing one arbitrator to act with another to be selected by the Ashland Hotel Company, for the purpose of ascertaining the expenses which had been incurred by the company in the erection of the cottage and other buildings, and in the improvement of the adjoining grounds. In April 1858 the arbitrators made their report, in which they stated that the railroad company furnished 'all the materials and executed all the work for the cottage building, except the painting, plastering, a portion of the window blinds, and the gas fixtures; that in respect to the gravelled walk and the decorations of the lawn, the gravel, and most of the labor of spreading it, were furnished by the railroad company, and that the cutting down of the trees and wood on the lavyn, and the grubbing and shrubbing of the lawn were done by the railroad company, and that the balance of the work, such as grubbing, ploughing and grass seeding, were done by the hotel company. They assessed the cost of the improvements as follows:
*359 The cottage, as far as completed by the pany,...... railroad com-$2,150 00
Bathing house and kitchen, . 350 00
Gravelled walk and work on lawn, 100 00
$2,600 00
At the same time the board passed a resolution confirming the report of the appraisers, and reciting that it had been agreed between the Railroad Company and the Ashland Hotel and Mineral Well Company, that the latter company should pay the amount assessed by the said report, and that the property upon which the said cottage and other improvements were located should thereupon be conveyed to said hotel company, and that a deed had been executed and tendered in accordance with said agreement, and directing the treasurer of the railroad company, before the delivery of the said deed, to require of the hotel company their obligation, payable bn demand for $4407 50, with interest, with Edwin Robinson as security, who should execute his individual bond for the same sum, and pay-, able in like manner, and deposit with the treasurer one hundred shares of the stock of said company, with a power of sale as a further security.
It was further proved by the defendants that, for several years prior to 1856, Edwin Robinson claimed the hotel and cottage lots as his own, and had expended large sums in the improvement of them; that he built a hotel upon the hotel lot, which he kept by an agent; that the improvements put upon the property by Robinson were very extensive, the cost of them in 1856, at which time they had all been completed, being some $50,000 or $60,000; that he had built and paid for two cottages on the cottage lot, and had also paid for certain additions to the ball room, which was on the said lot, and for certain repairs to the fencing and other job work on the said lot, all before 1856; that the cottage *360 lot was used by Robinson in conjunction with the hotel lot, the ball room, billiard saloon and bowling alley on the cottage lot; that Edwin Robinson was the principal if not the only stockholder in the Ash-land Hotel and Mineral Well Company; that after the appraisement aforesaid, the property above mentioned was conveyed to .said company; that Robinson about 1865 and 1856 was hard run for money, but that his credit was good, and he could always borrow large sums.
It was proved, on the part of the plaintiffs, in addition to the facts already mentioned, that, prior to the fall of 1860, Edwin Robinson had failed, and left the State of Virginia; that he was a man of integrity, and that the plaintiff Snead had, from time to time, lent him money, for some of which he still held his bonds; that payment of the debt claimed in this action was not claimed of the defendants before the fall of 1860 (wjien the action was commenced), because the plaintiffs were not in want of money, and the debt bore interest, and was considered a good investment.
It was further proved by the treasurer of the defendants, that while Robinson was president he did sometimes execute notes for the defendants; that these notes were in printed forms, in which the company promised to pay, and were signed by Robinson as president; that the usual mode of certifying work done for the company, was for the superintendent to certify what was done and its value, and to accompany the certificate with an order on the treasurer to pay it, which was the course required by the regulations of the company; and that the witness had never known the president to give such certificate for work done for the company.
The defendants further proved that about twelve years before the trial (which was in March 1868), a witness who met the plaintiff Snead at Ashland, heard *361 him say, that he was very busy doing some work for Mr. Robinson on the cottage lot.
These are all the material facts of the case.
The original contract of hiring was made with the plaintiff Snead by Robinson, who was then the president of the railroad company. Both he and the company were then probably engaged in doing work upon the cottage lot, though it does not appear when Robinson commenced his improvements upon that particular lot. The terms of the contract, except as to the price, do not appear; as far as appears nothing was said about the particular work for which the negroes were hired, or as to the party who was to pay the hire. The contract was made some time in the fall of 1854, and the slaves worked in the months of November and December of that year. "What particular work they did in those months does not appear; but it does appear that the work, whatever it was, was done under the direction of Thompson, who was a section master of the defendants. The necessary inference is, that it was work done for the defendants; for it cannot be presumed that the agent of the defendants would have the direction of the hands engaged in working for any party other than the defendants.
Whether there was a new contract after January 1, 1855, when the control of the slaves and the making of the contracts for their labor, were turned over to the plaintiff Smith, does not appear. But the slaves still worked as before, under the direction of Thompson, who was still a section master of the defendants. They so worked, sometimes on the railroad of the defendants, and sometimes on the cottage lot. And it does not appear that these slaves worked at any time upon the cottage lot, except under the direction of said Thompson. The inference must be, for the reason already assigned, that all the work done by them on the said lot, was done for the defendants, and that *362 They were, therefore, em-they were in their service. ployed sometimes upon the cottage lot, and sometimes the railroad, as occasion required, but always under the direction of Thompson.
And accordingly the plaintiffs understood that their contract was with the railroad company. Snead advised Smith to go to Richmond to settle his accounts with the company. Smith went to Richmond and had the settlement, and when he came back told Snead that he had taken a note with interest, but that in consequence of the action of Thompson he had been compelled to lose about $100. Robinson was then in good-credit.
"Why should Snead then treat the claim to be settled as one against the company, if it was really against Robinson ? And what had Thompson to do with the claim, except as the' agent of the defendants, under whose direction the slaves had worked in their service?' It further appears, that the payment of the note was not sooner demanded of the defendants, only because it bore interest, and was regarded as a good investment.
But that is not all, for it appears that some of the first work done by the plaintiffs’ slaves was paid for by the defendants. This was an admission that the slaves were in their service, and, in the absence of notice to the company, gave the plaintiffs a right to look to the defendants for the payment of the subsequent hires, at least to the extent of all the work done upon their property.
It is true that Robinson was, at the same time, doing work at his own expense, upon the cottage lot; but it does not appear that the' slaves of the plaintiffs did any work on that lot, or elsewhere, under his direction, or under the direction of any agent or servant of his. The improvements put upon the cottage lot by him may have been more extensive and costly than those *363 put upon it by tbe defendants, but it appears that those of the defendants amounted to $2,600, at least. And while Eobinson claimed the lot under an executory agreement with himself as president of the company, with the terms of which he had not yet complied, and which had not yet been assented to by the board of directors, the title was confessedly in the defendants, and so remained until after April 13,1868.
It is insisted, however, that the appraisement of the arbitrators shows that of the $2,600 assessed by them as expended by the .railroad company upon the improvement of the cottage lot, only $100, was for such labor as would probably be performed by slaves. But this proves nothing against the plaintiffs. They were not privy to that appraisement, and are not bound by it. The slaves may have performed labor in connection with the cottage, bathing house and kitchen, and which was. therefore, embraced in the first two items of $2,150, and $350, or it may have been the intention of Eobinson to charge himself with the payment of the note held by the plaintiffs, although the work was done for and on the credit of the company, and he may, therefore, have given no account of it to the arbitrators. But, however all this may have been, and whatever Eobinson may have done or intended, without the knowledge and assent of the plaintiffs, the work, as we have seen, was done upon a lot belonging to the defendants ; it was done under the direction of an agent and servant of the defendants, while they were engaged in making improvements on the said lot; the plaintiffs understood and believed that their contract was with the defendants, and, therefore, gave credit to them alone; and they were justified in thus giving credit to the defendants, by the fact that the defendants had paid them for part of the labor of the same slaves, and had not notified them that they would be liable no longer', even for work done on their property.
*364 The authority of Robinson as president of the railroad company, to make contracts for the necessary for the company, was incident to his office, and bas not been disputed. So he might furnish evidence 0f the amount payable under the contract, either before or after the performance of the service, and put evidence, in his discretion, into the form of a due-bill or promissory note. Such incidental powers exist by law and general usage, and exist in all cases where the authority of the president is not restricted by special legislation, or by regulations of the company known to the other contracting party. And it is obvious from the testimony of the treasurer, that there was then no regulation of the company restricting the power of Robinson to execute promissory notes for the company.
The argument, however, is, that as Robinson usually gave notes of the company on printed forms, and signed them as president, it is to be presumed that the paper given to the plaintiffs, which is not on a printed form, and not signed as president, was not intended to bind the company. It is not proved that he never gave an acknowledgment of debt, or made any other paper binding the company, except on a printed form, and with the addition of president to his signature. But if that had been proved, it would only have been a circumstance to be weighed by the jury, in determining the question in this case, namely, whether the work for the price of which the action is brought, was done for the defendants, and so as to make them liable to pay for it.
Upon the whole, I am of opinion that the verdict of the jury is fully sustained by the facts proved.
It is not necessary therefore to say anything in reference to the case of Slaughter’s adm’r v. Tutt, 12 Leigh 147, which was cited in the argument by the counsel for the -railroad company, to show that as the facts *365 proved, and not the evidence merely, has been certified, we ought to draw our own conclusions from them, uninfluenced by the opinion of the jury or of the Circuit court. That case, however, admits, that when the facts proved do not establish the fact necessary to a just conclusion, hut such further fact is to he inferred from the facts proved, and the facts proved leave it uncertain whether such further fact can or cannot he fairly inferred, respect ought to he paid by the appellate court to the verdict and judgment in the court below ; and I apprehend that respect should thus be paid to the verdict, and judgment below, in every case where the ultimate facts upon which the legal conclusion in the case must rest, are to he deduced by balancing the different facts proved, and by weighing and comparing the inferences to he drawn from them. In such a case, this court should not reverse the judgment upon the verdict, unless it be a case of “plain deviation.”
I am of opinion, therefore, to affirm the judgment.
Hives, J. concurred in the opinion of Joynes, J.
Judgment arrirmed.